# EXHIBIT E

Noah

Noah Offer ID: 104166

# The Noah Real Estate Purchase Option Agreement

On 12/15/2021 ("**Effective Date**"), Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively, "**Owner**") accepts funds from Noah (fka Patch Homes, Inc.), a Delaware registered C. Corp, ("**Investor**") as consideration for this Option on the real property commonly known as 484 Main Street, Tisbury, Massachusetts 02568 and as more particularly described on attached Exhibit A (the "**Property**"). In exchange, Owner irrevocably grants to Investor the right to an interest in the Property and agrees to various other covenants for the benefit of Investor, all described in this document (the "**Option**" or "**Agreement**").

## 1. FINANCIAL TERMS.

$2,375,000.00 **Initial Appraised Value**
The Initial Appraised Value is the appraised value of the Property agreed to by the Owner at the time of origination of the Option, typically by appraisal or other valuation method.

$500,000.00 **Noah Investment Amount.**
The Noah Investment Amount is the money that the Investor provided to the Owner as part of the consideration for this Option.

$1,299,087.00 **Maximum Authorized Debt.**
The Maximum Authorized Debt is the highest total amount of principal that the Owner may owe on all loans secured by the Property.

10 years **Planned Expiration Date.**
The Planned Expiration Date is 10 Years from the Effective Date. This is the latest date by which Owner must pay the Net Option Value to Investor.

32.000% **Noah Share.**
A term used to approximate the economic value of the Investor's Percentage Share in the Property, represented as a percentage of the current value of the Property. It is further defined in Exhibit B.

Noah

Noah Offer ID: 104166

18% **Capped Rate.**
This rate is used to compute the maximum Net Option Value at the time of exit of this Option, unless the Early Termination as defined in Section 9 applies.

Primary Residence **Occupancy Type.**
This is used to understand whether the Property is being utilized as a "Owner Occupied / Primary" or an "Investment / Rental" Residence.

## 2. CREATION OF OPTION AND PAYMENT OBLIGATION.

2.1. Owner irrevocably grants to Investor and its successors an option to purchase the Percentage Share of the Property as an undivided ownership interest on the terms and conditions described below. Owner hereby acknowledges receipt of the Noah Investment Amount and agrees that the contribution of the Noah Investment Amount in advance of exercising the option, the resulting ability of Owner to use such funds interest-free from the time of this Agreement until the time the Option is exercised, and the subsequent payment of the Remaining Portion of the Exercise Price at exercise of the Option, is ample consideration for the Option and for the related covenants of Owner described below.

2.2. Owner recognizes and agrees that by entering into this Option, Owner is not obtaining a loan from Investor, but instead is granting an Option to Investor and thereby the right to purchase a fractional interest in the Property and become a co-owner in the Property. If Investor allows the Option to lapse, Owner shall not be obligated to return or repay the Noah Investment Amount.

2.3. Owner further agrees to pay Investor the Net Option Value described in Section 3 or Section 10. Owner acknowledges and understands that their obligation to pay Investor the Net Option Value will be settled in cash and is not conditioned on Investor purchasing, or taking title to, any ownership interest in the Property. To secure performance of the obligations created by this Option, Owner has made Investor the beneficiary of a deed of trust for the Property (the "Security Instrument"). If Owner fails to satisfy any of their obligations to Investor, then, following notice and an opportunity to cure as described in Subsection 13.1, Investor will have the right to foreclose on the Property as described in the Security Instrument.

## 3. CALCULATION OF NET OPTION VALUE.

The elements and procedures needed to calculate the Net Option Value are as follows.

3.1. **Investor's Price.** Investor's Price is the Percentage Share multiplied by the Noah Agreed Home Value.

3.2. **Remaining Portion of the Exercise Price.** The Remaining Portion of the Exercise Price is the difference between Investor's Price and the Noah Investment Amount.

3.3. **Ending Property Value**. The Ending Property Value is the total of: (i) greatest of: (a) the Adjusted Sale Price and (b) the Adjusted Appraised Value, or (c) the Early Termination Minimum Value if applicable as described in Section 9; (ii) minus any Positive Adjustment; and (iii) plus any Negative Adjustment. For purposes of this Option, the **"Adjusted Sale Price"** is the price at which Owner sells the Property subject to Appraiser Adjustments and the adjustment process as described in

Section 6, and the "**Adjusted Appraised Value**" is the fair market value of the Property determined by a Qualified Appraiser subject to Appraiser Adjustments and the adjustment process as described in Section 6.

3.4. **Net Option Value.** The Net Option Value is calculated by multiplying the Percentage Share by the Ending Property Value and subtracting the Remaining Portion of the Exercise Price, but the minimum Net Option Value is zero.

3.5. **Capped Return Amount.** The Net Option Value is not to exceed the Capped Return Amount, unless the Early Termination as defined in Section 9 and 10 applies. The "**Capped Return Amount**" is calculated as equal to: Noah Investment Amount * [(1 + Capped Rate) ^ (Number of years since Effective Date)]. For the purposes of this Option, the Capped Rate is equal to 18.00%.

3.6. **Percentage Share.** That undivided fractional interest in the Property that Investor has the right to acquire and Owner has agreed to sell if the Option is exercised. In this Agreement, the Percentage Share is 68.421%.

4. **OWNER'S RIGHT TO SELL.** Owner has the right to sell the Property at any time, but only subject to the following requirements and procedures.

4.1. **Permitted Sale.** A Permitted Sale is a sale of the Property that meets all of the following conditions: (i) made on commercially reasonable terms and entered into in good faith; (ii) is made at arm's length and the buyer is not Owner's friend, family member, or associate or an entity or agent acting on behalf of any such person. If the sale of the Property does not meet the above mentioned criteria, then the Investor has a Right of First Refusal to the sale in order to make sure that the sale is a Permitted Sale.

4.2. **Marketing Notice.** As soon as practical, but in no event less than forty-five (45) days prior to beginning efforts to market the Property for sale, the Owner shall provide written notice (a "**Marketing Notice**") to Investor. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Marketing Notice. A Marketing Notices is a mandatory prerequisite for an Offer Package under Subsection 4.3, no Offer Package shall be deemed valid unless it is received between 30 and 180 days after a Marketing Notice.

4.3. **Offer Package.** Prior to entering into any binding obligation to sell the Property, Owner shall provide to Investor an "**Offer Package**" consisting of: (i) complete and unaltered copies of the offer Owner wishes to accept (the "Owner Chosen Offer") together with copies of any documents and descriptions of any oral agreements, under which Owner would receive any consideration in addition to the price shown in the Owner Chosen Offer; and (ii) all listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months.

4.4. **Determining Ending Property Value and Net Option Value.** If the sale is a Permitted Sale, the Ending Property Value shall be the Adjusted Sale Price determined as described in Section 6. Otherwise, the Ending Property Value shall be the greater of the Adjusted Sale Price or the Adjusted Appraisal Value determined as described in Section 6.

4.5. **Exercise of Option.** If the Net Option Value is greater than zero, Investor shall exercise its option, thus obligating the Owner to pay Investor the Net Option Value. Such exercise shall not require any notification by investor to Owner, or any other action by investor. If the Net Option Value is zero, then Investor shall not exercise its option, in which case Owner shall not share with Investor any sale proceeds and shall not return to Investor any portion of the Noah Investment Amount unless Section 9 (Early Termination Minimum Value) or Section 13 (Default) applies. Owner understands and acknowledges that Investor will not share in any losses suffered by Owner beyond the forfeiture of the Noah Investment Amount, and that, under such circumstances, Noah Investment Amount may constitute taxable income.

4.6. **Sale Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument, conditioned upon the payment of the Net Option Value (if greater than zero), any amounts due under Sections 9 or 13, and any outstanding fees or obligations under this Option or the Security Instrument. Investor shall not pay any part of the costs and expenses associated with selling the Property, such as sales commissions, transfer taxes, or title or escrow fees.

5. **OWNER'S RIGHT TO TERMINATE THE OPTION.** Owner has the right to terminate the option and keep the Property, but only subject to the following requirements and procedures.

5.1. **Termination Package.** If Owner wishes to terminate the option without selling the Property, they shall provide to Investor a "**Termination Package**" consisting of written notice of Owner's intent to terminate the option, along with complete and unadulterated copies of any listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Termination Package.

5.2. **Determining Ending Property Value and Net Option Value.** The Ending Property Value shall be the Adjusted Appraised Value of the Property Determined as described in Section 6, or in the event the Early Termination Minimum Value applies, as described in Section 9, then the Ending Property Value shall be the Early Termination Minimum Value.

5.3. **Exercise of Option.** If the Net Option Value is greater than zero, and Owner provides Investor a written "Confirmation Notice" confirming Owner's intent to terminate within 10 calendar days of receiving the Appraisal Report described in Section 6.1, Investor shall exercise its Option, thus obligating Owner to pay the Investor the Net Option Value. Such exercise shall not require any notification by Investor to Owner, or any other action by Investor.

5.4. **Termination Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument conditioned upon payment of the Net Option Value (if greater than zero), any amounts due under Section 9 or 13, and any outstanding fees or obligations under this Option Contract or the Security Instrument, within 30 calendar days of the Confirmation Notice.

5.5. **Clawback Provision.** If Owner transfers the Property within six months following Investor's receipt of the Termination Package, Owner shall be obligated to notify Investor of such transfer in writing and pay to Investor, immediately upon written demand, the amount by which the Net Option Value, calculated based upon the amount paid to Owner by the transferee (without deduction of sales commissions, transfer taxes, sale costs, outstanding debts and mortgages, or other expenses) exceeds the amount (if any) previously paid to Investor.

6. **APPRAISAL RIGHTS.** The "**Noah Agreed Home Value**", "**Adjusted Sales Price**" and "**Adjusted Appraised Value**" shall be determined as described in this Section. In each case: (i) Investor shall initially select the Appraiser and/or Appraisal Management Company (AMC) to conduct an independent third party appraisal; the Investor may also rely on automated valuation models (AVMs) to determine the appraisal; (ii) Owner may trigger additional appraisals if they believe the original appraisal contains material omissions or errors; (iii) Owner must cooperate in good faith to facilitate inspections and appraisals; (iv) each party must provide to the other copies of all appraisals and related inspection reports; and (v) Owner shall pay all expenses associated with appraisals and inspections, regardless of whether these are obtained by, or at the request of, Owner or Investor.

6.1. **Noah Agreed Home Value.** The Noah Agreed Home Value of the Property shall be determined, in part, by an appraisal in accordance with this Section at the time of the origination of the Option between the Owner and the Investor (the "**Initial Appraised Value**"). A "**Cash Market Adjustment**" shall be applied to the Initial Appraised Value based on: (i) the risks and benefits to Investor and Owner associated with each party entering into the Agreement, and (ii) Investor and Owner having each diligently considered the value of the Property based on all such risks and benefits and all other material considerations, notwithstanding any other assessment, valuation, appraisal, or other public or confidential information to the contrary, or any written or oral communications to Owner in connection with

the marketing, advertising, negotiation, or execution of the Agreement, or other such communication, the financial terms that shall apply under the Agreement. The Cash Market Adjustment applicable to this Option is 16.000%. The Noah Agreed Home Value of the Property is calculated as the Initial Appraised Value multiplied by (1 - Cash Market Adjustment). The Noah Agreed Home Value of the Property agreed to in this Option is $1,995,000.00.

6.2. **Inspections and Appraisal.** Following receipt of a Marketing Notice under Subsection 4.2, or a Termination Package under Subsection 5.1, Investor shall provide written notice to the Owner of the identity of the inspector(s) and/or Appraiser it retains, and the time and date of any inspections or appraisals. The inspections and appraisal shall be conducted as quickly as reasonably possible, and the Appraiser shall prepare an "Appraisal Report" containing the fair market value of the Property and, if applicable, any "Appraiser Adjustments" as described below. Investor shall use its best efforts to provide the Appraisal Report within 30 calendar days; however, Investor shall not be liable for any loss resulting from failure to meet this time deadline.

6.3. **Negative Adjustment.** If any Appraiser determines that Owner failed to maintain and repair the Property as required by Subsection 10.2 and that any alteration of the Property by Owner reduced the fair market value, the appraiser shall make an Appraiser Adjustment by increasing their valuation by the amount they believe the fair market value has been reduced by the improper maintenance or alteration.

6.4. **Positive Adjustment.** If Owner believes that material improvements (defined as home improvements costing $5,000 or more at a point in time), other than maintenance and repair required under Subsection 10.2, have increased the fair market value of the Property, they shall provide written notice of such a belief (a "**Modification Adjustment**") to Investor, including photographs, construction drawings and other documentation depicting the alteration, and proof that the alteration has been made with all required governmental permits and approvals. For Owner to receive a Positive Adjustment, they must submit a Modification Adjustment as part of the Marketing Notice under Subsection 4.2 or as part of a Termination Package under Section 5.1; Owner shall not receive a Modification Adjustment if they fail to submit such a request within the required time frame. The material submitted by Owner shall be provided to the Appraiser selected by Investor under Subsection 6.1, who shall make an Appraiser Adjustment by decreasing their valuation by the amount they believe the fair market value has been increased by the alteration. The adjustment shall be based solely on the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence, and shall not be based on the actual or inferred cost of the alteration. The adjustment shall be based solely on the lesser of: (i) the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence; or (ii) the actual or cost of the alteration as determined by the documents submitted by Owner to Investor.

6.5. **Appraisal Disagreement.** If Owner believes the Adjusted Appraised Value determined by Investor's Qualified Appraiser is affected by material omissions or errors, Owner shall have a period of two business days following receipt of the Appraisal Report to provide Investor written notice of disagreement, and 10 calendar days following receipt of the Appraisal Report to obtain, at Owner's sole expense, and provide to Investor, an alternative Adjusted Appraised value along with a supporting appraisal by a Qualified Appraiser. If Owner fails to meet either of these time deadlines, then the original Adjusted Appraised value obtained by Investor shall be final and binding; otherwise, the following provisions shall apply. If the difference between the Adjusted Appraised Value obtained by Investor and Owner is no greater than five percent of the higher value, then the average of the two values shall be the final and binding Adjusted Appraised Value and the Appraiser Adjustments from Investor's Appraisal Report shall be used to calculate the Adjusted Sale Price. If the difference between the Adjusted Appraised Values obtained by Investor and Owner is more than five percent of the higher value, the two Qualified Appraiser shall selected a third Qualified Appraiser to provide an Adjusted Appraised Value, and the final and binding Adjusted Appraised Value shall be determined by averaging the two Adjusted Appraised Values that are closest together, and the Appraiser Adjustments from the third Qualified Appraiser's Report shall be used to calculate the Adjusted Sale Price. Any Qualified Appraiser retained by the Owner or selected by the other Qualified Appraiser shall consider all inspection reports, photos, plans and other documentation provided to the previous Qualified Appraiser(s) and shall make adjustments as per Subsections 6.2 and 6.3.

## 7. DEATH OF OWNER.

7.1. **Notice of Owner Death.** Within 60 days of the death of any person who has signed this Option as Owner, the deceased's successor in interest shall provide written notice to the Investor. If the successor has not previously signed this Option, they shall do so immediately upon written demand, and failure to do so shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument.

7.2. **Right to Early Conclusion Following Owner Death.** If every person comprising Owner has died, Investor may trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" to the then owner(s) of record (collectively the "Successor Owner"). The Early Conclusion Notice shall specify an "Early Conclusion Date" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice. In instances where there is a Successor Owner, the term "Owner" shall be deemed to refer to and include such Successor Owner (regardless of whether they signed the Option as required

under Subsection 7.1); however, such post-death usage of the term "Owner" shall not prevent the application of the first sentence of this Subsection.

8. **CONCLUSION OF OPTION.** In this Section, the term "Expiration Date" shall mean the Planned Expiration date; however, if there is an Early Conclusion triggered under Subsection 7.2 or 13.6, then the term "Expiration Date" shall mean the Early Expiration Date. At least three months before the Expiration Date, Owner must either provide an Offer Package satisfying each of the requirements of Subsection 4.3 or provide a Termination Package satisfying each of the requirements of Subsection 5.1; failure to provide such items within the required time frame shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument. Depending on which package Owner provides, the procedures described in Section 4 or Section 5 shall be followed, and Owner shall be required to pay the amounts described in such Sections, or in Section 9 or 13 (if applicable). Owner hereby irrevocably instructs the escrow agent holding Owner's funds and proceeds in escrow from any sale or refinance of the Property that follows Owner's presentation of an Offer Package or Termination Package to disburse, from such funds, directly to Investor, all amounts owed to Investor, and Investor may submit this Option Contract as disbursement instructions.

9. **EARLY TERMINATION MINIMUM VALUE.** Notwithstanding anything to the contrary in this Option, if the Owner sells the Property, or terminates the option without selling, before the Planned Expiration Date, the home value utilized to determine the Net Option Value shall be the "**Early Termination Minimum Value**". The amount of the Early Termination Minimum Value shall depend on when the Owner sells the Property, or terminates the option without selling, as described below. All parties agree that the actual damages suffered by Investor in the event of early termination would be difficult or impossible to ascertain, and the Early Termination Minimum Value amounts described below are reasonable under the circumstances. The payment of an Early Termination Minimum Value shall not relieve the Owner of the obligation described in Subsection 5.5.

   9.1. **Termination Within First Three Years.** If the Owner terminates the Option without selling within the first three years of the Effective Date, then the Early Termination Minimum Value shall be at least a value equal to the Initial Appraised Value. Requiring this minimum is intended to ensure that Investor receives a reasonable return on its investment if Owner decides to terminate the Option before the property has had a reasonable opportunity to appreciate in value.

   9.2. **Termination After Three Years but Before the Planned Conclusion Date.** If Owner terminates the Option without selling more than three years after the Effective Date, but before the Planned Conclusion Date, the the Early Termination Minimum Value shall be a value equal to at least the Noah Agreed Home Value.

This would result in the Investor receiving at-least the Noah Investment Amount, meaning Investor will get all of its money back regardless of the Property value. Requiring this minimum is intended to ensure that Investor does not lose money if Owner decides to terminate the option without selling before the Planned Conclusion Date.

**10. OWNER COVENANTS.**

10.1. **Mortgages and Liens.** Subject to Investor's advance written approval, which shall not be unreasonably withheld, Owner may obtain one or more loans secured by the Property, provided: (i) the total amount owed does not exceed the Maximum Authorized Debt; and (ii) no such loan involves negative amortization, lines of credit, further lender advances, lender appreciation sharing, or any other provision under which the loan amount could exceed the Maximum Authorized Debt. Owner may request the Investor's consent to new financing at any time. If Investor consents, it shall execute documents subordinating the Security Instrument to new financing. Owner shall service and repay 100% of the debt secured by the Property in accordance with all requirements of the lender. Owner understands and acknowledges that, upon sale of the Property, their obligation to lenders may exceed their sale proceeds. The Investor may charge the Owner a nominal fee for the preparation of the subordination documents.

10.2. **Maintenance and Repair.** Owner, at their sole expense, shall maintain the Property in a general state of repair at least equivalent to that on the Effective Date, immediately correct conditions that endanger the integrity of the Property or the safety or health of the occupants, guests or public, and promptly comply with all requirements imposed on the Property by governmental agencies or owners' associations. In the case of sudden or unexpected damage to the Property, Owner's repair obligations apply regardless of the extent (if any) of insurance coverage. Owner shall obtain all required governmental and owner association permissions, inspections and approvals for all work performed on the Property. Upon receipt of a written notice so requesting, the Owner shall promptly allow inspection of the Property by Investor or Investor's agents or contractors.

10.3. **Insurance.** Owner, at their sole expense, shall at all times maintain in effect the following policies of insurance for the Property: (i) a policy of "all risk" casualty insurance acceptable to Investor in its reasonable opinion, providing coverage for such risks are commonly covered with respect to properties similar to the Property in construction, location and use, with coverage in an amount equal to the full replacement value of the insured elemes plus required building code upgrades; (ii) if, based on the Property location, there is a 25% or greater chance of a flood over a 30-year period, a flood insurance policy with coverage in an amount equal to the full replacement value of the insured elements plus required building code upgrades; and (iii) any other policies of insurance for the Property

that are required pursuant to the terms of any loan secured by the Property. Each such policy shall name Investor as an additional insured. Copies of all insurance policies shall be provided to In Investor promptly upon issuance. All proceeds paid by any insurance carrier for damage to the Property shall be used by the Owner to repair such damage. Owner shall provide to Investor: (i) proof of having all required insurance each year on December 31, and again promptly upon receipt of a written notice so requesting; and (ii) copies of notices of any insurance change or cancellation within seven calendar days of Owner's receipt of such notices. Owner acknowledges that in case they do not provide the proof of insurance to the Investor as mentioned above, the Investor shall obtain the required insurance on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.4. **Property Tax and Other Ownership Expenses.** Owner, at their sole expense, shall pay when due all taxes and assessments imposed by any governmental entity, all dues and assessments imposed by any owners' association with a right to lien the Property, and all service charges and fees imposed by any public utility with a right to lien the Property ("**Property Taxes**"). Upon receipt of a written notice so requesting, Owner shall promptly provide proof of payment to Investor or Investor's agents. Owner acknowledges that in case they do not provide the proof of payment of Property Taxes to the Investor as mentioned above, the Investor shall pay the required Property Taxes on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.5. **Occupancy and Use**. Owner shall use the Property as listed in Section 1. If the Property is marked as "Owner Occupied / Primary" residence, then the Owner shall use the Property as his/her primary residence beginning within 60 days after acquiring title and continuing for at least one year. After which date, Owner must provide notice if the Property will not be used as his/her primary residence within 10 business days of the change in residency. Owner shall not commit waste on the Property, permit illegal activities to be conducted on the Property, or allow the Property to be used in any manner that violates governmental regulations, creates a nuisance, increases insurance rates, or endangers occupants, guests, neighbors, or the general public. Owner acknowledges that they have read Exhibit C to this Option, titled "NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT" and completed it in full.

11. **TRANSFER RESTRICTION AND REQUIREMENTS.** Owner shall not transfer any interest in the Property without Investor's advance written approval, and such approval may be withheld at investor's sole and absolute discretion. If a transfer is approved, Owner shall pay all costs associated with the creation, signing, and recordation of

transfer documents, including any modification of this Option or the Security Instrument.

**12. REQUIRED NOTIFICATIONS**. Owner shall provide the following written notifications to Investor.

12.1. **Events Affecting the Property.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) any lien recorded against the Property; (ii) any fire, flood, or other sudden or unexpected event causing damage to the Property for which the cost of repair is likely to be more than $5,000; (iii) any insurance claim or insurance cancellation; (iv) receipt of any notice relating to potential or actual action against the Property or its owners involving condemnation or eminent domain; and (v) any other even that could have a significant impact on the value of the Property.

12.2. **Planned Alteration.** Prior to beginning work, Owner shall provide Investor written notice of any significant alteration to the Property, including demolition or addition of walls, elimination or addition of kitchens or bathrooms, increasing or decreasing habitable dwelling area, or remodeling projects for which the total cost is expected to exceed $25,000. Owner shall include with such written notice construction drawing of the planned alteration and photographs of the areas of the Property that will be modified.

12.3. **Events Affecting Ownership of Occupancy.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) a voluntary or involuntary bankruptcy proceeding under which any signatory to this Option, or any owner of record of the Property, will or may be adjudicated bankrupt; or (ii) any marriage, death or divorce involving any owner of the Property.

**13. CONDEMNATION.**

13.1. If the Property is condemned, in part or in whole, all condemnation proceeds net of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated in the following order: (i) to payment of any lien senior to this Option; (ii) to Investor, an amount equivalent to the Net Option Value as it would have been calculated prior to the condemnation; (iii) and to Owner, the balance of the proceeds.

13.2. If the Property is condemned in part, and if the Option has not been exercised, the following provisions shall apply. The Net Condemnation Proceeds shall be used, first, to pay all liens senior to this Option, provided that such payment may result in the discharge of the related liens. Any remaining Net Condemnation Proceeds shall be distributed as follows: (i) to Investor, an amount equal to the

Percentage Share multiplied by the Net Condemnation Proceeds, including any associated unpaid Protective Advances, and other fees and charges; and (ii) to Owner, the balance of the proceeds.

## 14. DEFAULT.

14.1. **Owner Violations of this Option Contract.** If Investor believes that Owner has violated any provision of this Option Contract, or has intentionally misled Investor, or withheld material facts, either before this Option was executed or while it remains in effect, Investor shall provide to Owner a written Notice of Alleged Violation describing the alleged malfeasance and the "Cure Actions" Investor believes are required to remedy the situation.

14.2. **Notice and Opportunity to Cure.** If they wish to avoid Default, Owner must, within 14 calendar days from the effective date of the Notice of Alleged Violation, either: (i) perform each of the Cure Actions; or (ii) initiate binding arbitration pursuant to Subsection 13. If the alleged violation is failure to make timely payment of an expense described in Subsections 10.1, 10.3 and 10.4, or if Owner has opted out of mandatory binding arbitration by not initializing the bold-typed paragraph below Subsection 13.4, Owner may avoid Default only by performing each of the Cure Action within such 14-calendar day period. Payment of an expense described in Subsections 10.1, 10.3, and 10.4 may be made under protest, after which Owner may seek to recover amounts paid through arbitration as described in Subsection 13.5.

14.3. **Owner Default.** Owner shall be in Default if: (i) they receive a written Notice of Alleged Violation and fails to perform each of the Cure Actions within the time required by Subsection 13.2 or, where permitted under the last sentence of Subsection 13.2 and 13.5, the arbitrator finds that violation(s) described in the Notice of Alleged Violation has indeed occurred, and Owner fails to cure the violations during a period of 14 calendar days following arbitrator's ruling.

14.4. **Consequences of Default.** If Owner is in Default, Investor may take any or all of the following actions: trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" specifying an "**Early Conclusion Date**" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice; (ii) exercise any rights or remedies it may have under the Security Instrument including foreclosure and sale; (iii) pay any financial obligation of Owner under Subsections 10.1, 10.3, or 10.4, or undertake repairs of the Property reasonably required to prevent serious deterioration or damage, and in either case all expenses incurred by Investor shall be deemed a loan to Owner at the maximum interest rate permitted by law, with all interest and principal due immediately upon written demand, and with failure to pay constituting grounds for foreclosure under the Option

Security Instrument; or (iv) use any other remedy available at law or equity, serially or concurrently. Notwithstanding anything to the contrary in this Option Contract, if Investor chooses to trigger the Early Conclusion procedures, the following provisions shall apply:

i. Owner shall continue to be deemed to be in Default unless and until they satisfy all of the requirements of Section 8 including timely payment of the payment of the Net Option Value and any outstanding fees.

ii. When calculating the Net Option Value: (i) Owner shall not have the right to trigger additional appraisals if they believe the original appraisal obtained by Investor contains material omissions or errors; (ii) the Appraisal Report should be prepaid as if it were prepared on the date of the Owner Default, and (iii) Owner shall not be entitled to any of the rights and processes described in Section 6.3 and 6.4; and

iii. Notwithstanding anything to the contrary in this Option, Investor's Price shall be reduced by 20%. This adjustment is intended as liquidated damages for the expense and inconvenience incurred by Investor when Owner does not keep their promises. All parties agree that the amount of actual damages suffered by the Investor in the event of Default would be difficult or impossible to ascertain and that this Investor's Price adjustment is a reasonable estimate of such damages. THE ADJUSTMENT IS INTENDED TO COMPENSATE INVESTOR AS A RESULT OF OWNER'S DEFAULT IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTION 1671 AND WILL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY.

15. **INVESTOR RIGHTS.** Investor shall have the right to: (i) inspect the Property at its expense on up to two occasions each calendar year within 14 calendar days of written request to Owner; (ii) directly contact providers of insurance covering the Property, and holders of loans secured by the Property, at any tie, and Owner shall provide any required written authorization to Investor promptly upon request; (iii) participate in all discussions or negotiations regarding any condemnation or eminent domain relating to the Property; and (iv) transfer any or all of its rights under this Option at any time without the approval of Owner.

16. **SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST.** Homeowner appoints Investor, and its successor and assignees, in Homeowner's name to exercise the powers set forth below consistent with the provisions contained in this Option ("**Power of Attorney**"). This Power of Attorney will be exercised only: (i) when Investor

or its successor or assignees exercises or anticipates exercising the Option; and (ii) for the purpose of authorizing and empowering Investor to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein. Under this Power of Attorney, Investor will have the power and authority to do all the acts and execute any and all documents, instruments and agreement to market the Property, including but not limited to: solicit buyers for the Property, advertise the Property for sale on reasonable and customary terms and for a price that is reasonable for the market conditions; and sell the Property on usual and customary terms and conditions. The Power of Attorney granted hereunder is coupled with an interest. This Power of Attorney is a durable power of attorney and shall remain in force despite any Owner's subsequent incapacity, disability or death. Homeowner and Investor agree that if Investor is not allowed to exercise its rights under this Section 18, or if Owner fails to comply with its obligations under this Section 18, the damages to Investor would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to it in law, equity or otherwise, Investor shall be entitled to specific performance of the provisions of this Section 18.

17. **NOTICES.** Except where expressly prohibited by law, written notice shall be deemed properly provided to Owner or Investor if given by email at the intended recipient's last known email address. If Owner consists of more than one person, notice to any one such person shall be deemed notice to each such person. It shall be the responsibility of each person signing below as Owner, and of Investor, to (i) regularly monitor their email communication, and (ii) provide notice to all other parties when their email address changes. A written notification shall be deemed effective on the calendar day following the day it is sent via email. Where notice by email is expressly made inadequate by operation of law, notification shall be deemed effective on the earlier of the date on which it is actually received, or the date of deemed receipt specified by law for the manner in which the notice is given or, if no such date is specified, 10 calendar days after it is sent or published.

18. **MISCELLANEOUS TERMS.**

18.1. Owner shall be liable to Investor for all damages or losses that result from a violation of this Option, including late charges, penalties, and fines, and Investor shall be entitled to recover from Owner all costs incurred in connection with collection efforts, whether or not any arbitration or any foreclosure proceeding is filed, and all such costs and expenses shall be payable immediately upon written demand and until paid shall also be secured by the Security Instrument.

18.2. If Owner consists of more than one person, each such person shall be jointly and severally liable for all obligations imposed by this Option.

18.3. This Option: (i) is executed in and shall be governed by the laws of the state where the Property is located; (ii) may be amended only by a written document signed by both Owner and Investor; and (iii) shall be binding on the respective successors, assigns and personal representatives of each party signing as Owner and all those who become owners of record of the Property.

18.4. The invalidity or unenforceability of any provision shall not affect the validity or enforceability of any other provision. This Option, and the Security Instrument, contain the entire agreement between Owner and Investor relating to the Property, and any written or oral representations, modifications or agreements regarding these matters shall be of no force and effect unless contained in a subsequently dated, written document expressly stating such representation, modification or agreement, signed by Owner and Investor.

18.5. The failure of Investor to enforce, or to insist upon the strict compliance with, any term of this Option shall not constitute a waiver nor prevent enforcement of such term in any subsequent situation. Time is expressly declared to be of the essence.

18.6. In the event Owner is a trust, the trustee(s) signing below represent(s) and warrant(s) that the trust is authorized to enter into this Option and will be bound by its terms, and for purposes of this Option "Owner" means the trustee(s) acting on behalf of the trust.

19. **ATTORNEYS FEES.** If any dispute between Owner and Investor should result in litigation or arbitration, the prevailing party shall be entitled to recover from the other all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including reasonable attorney fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (i) attorney fees shall include, without limitation, fees incurred in bankruptcy litigation, post judgment motions, discovery, contempt proceedings, and examinations (debtor and third party) relating to garnishment and levy; and (ii) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

Noah

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

Patricia Bransford

Patricia S Bransford

Noah

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

______________________

Patricia S Bransford

## EXHIBIT A

## LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

Noah

Noah Offer ID: 104166

## EXHIBIT B

### NOAH SHARE APPENDIX

Reference is made to that certain Real Estate Purchase Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property, ("Owner") and Noah, f.k.a Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

1. Based on the Agreement, the Owner is issuing to the Investor the right to obtain an undivided, fractional ownership interest. The economic value of this interest represented as a percentage of the value of the home, is defined as the **Noah Share.** Specifically, the Noah Share can be calculated at any time is obtained by dividing (i) (A) the Net Option Value or (B) the proceeds due from the Owner to the Investor in order to terminate this Real Estate Option Purchase Agreement, by (ii) the Ending Property Value. Each of these terms has been defined in the Agreement. The Owner recognizes that the Ending Property Value will only be known at the time of the Agreement termination and/or Expiry – and therefore the exact value of the Noah Share at the time of the termination and/or Expiry will be calculated at that time on a future date.

2. The following tables provide an illustrative example for the Owner(s) on how the Noah Share changes based on Ending Property Value. It demonstrates that as the Property changes in value, the Noah Share also changes, resulting in the Investor sharing in the losses and/or potential future gains of Property value with the Owner.

| Ending Property Value | Net Option Value | Noah Share |
|---|---|---|
| $2,018,750 | $516,250 | 25.573% |
| $2,090,000 | $565,000 | 27.033% |
| $2,161,250 | $613,750 | 28.398% |
| $2,232,500 | $662,500 | 29.675% |
| $2,303,750 | $711,250 | 30.874% |
| $2,446,250 | $808,750 | 33.061% |
| $2,517,500 | $857,500 | 33.061% |
| $2,588,750 | $906,250 | 35.007% |
| $2,660,000 | $955,000 | 35.902% |
| $2,731,250 | $1,003,750 | 36.751% |

**Noah** Noah Offer ID: 104166

3. THE OWNER RECOGNIZES THAT THE ABOVE TABLES ARE SIMPLY AN ILLUSTRATIVE EXAMPLE AND THAT THE ACTUAL PROPERTY TERMINATION PRICE MAY BE DIFFERENT THAT THE VALUES SHOWN ABOVE. Owner also acknowledges that the Noah Share is a concept that was used as a consumer education tool to understand the economics of the Agreement. It does not reflect the entirety of the Agreement, which is detailed in the Agreement itself.

**ACKNOWLEDGED BY OWNER(s):**

Patricia Bransford

Patricia S Bransford

Noah

Noah Offer ID: 104166

## EXHIBIT C

### NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT

Reference is made to that certain The Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property ("Owner") and Noah, f.k.a. Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

This Notice and Acknowledgment (the "Acknowledgment") contains important disclosures about the rights and liabilities of spouses, domestic partners, family members, and other non-Owner occupants of the Property (collectively referred to as "Non-Owner Occupant(s)"). Please READ IT CAREFULLY.

This Acknowledgment must be signed by all Owners entering into and executing the Agreement and by all Non-Owner Occupants who have attained the age of 18 (or such other age of majority under applicable state law, if otherwise). As a prerequisite to entering into the Agreement, all Owners are responsible for ensuring that a complete and accurate version of this Acknowledgement is returned to the Investor with the signatures of all Owners and all Non-Owner Occupants who have attained the age of majority under state law.

The rights of a Non-Owner Occupant to occupy or retain possession of the Property following: (i) the Owner ceasing to occupy the Property as required by Section 10 of the Agreement (if applicable) or (ii) the death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), or (iii) certain other triggering events (including a Default), as specified in the Agreement, may be significantly affected by the operation or enforcement of the Agreement because, among other things, the Agreement gives Investor the right to exercise its option and to purchase an undivided fractional interest in the Property upon such triggering events. For example, one such triggering event is death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), regardless of whether Non-Owner Occupants are occupying the Property at that time. A Non-Owner Occupant of a Property subject to the Agreement will be required to comply with and settle Investor's exercised rights and remedies even if the Non-Owner Occupant inherits the Property as the heir, beneficiary or survivor of an Owner. Depending on the appreciation of the Property during the term of the Agreement, the amount required to be paid to settle Investor's rights and remedies may be substantial. In addition, following a Default (including default by Non-Owner Occupants), Investor may be entitled to exercise their remedies under the

Agreement following a Default, resulting in a Non-Owner Occupant losing possession and/or ownership of the Property.

Investor cannot know who occupies the Property if those persons are not named on title to the Property and in a deed recorded in the public records. Investor must and will rely on Owner to supply this information accurately and completely.

Throughout the term of the Agreement, Owner is responsible for promptly notifying Investor of any change in the status of Non-Owner Occupants. All Owners are responsible, in the event of any such change in status, for promptly returning a complete and accurate additional Acknowledgment to Investor with the signatures of all new Non-Owner Occupants who occupy the Property and of all previous non-adult Non-Owner Occupants when such person attains the age of 18 (or the age of majority under applicable state law, if otherwise).

In the event that Owner wishes to add any other person to the title of the Property after the Effective Date of the Agreement, Owner agrees that such person shall meet all then-current Agreement requirements and must execute a complete set of the legal documents reasonably requested by Investor. Unless and until these requirements are met, any such individual who is a Non-Owner Occupant shall remain as such, subject to all contractual rights of Investor.

All Owners and Non-Owner Occupants acknowledge that they have read and understand this Acknowledgement, and that they have been advised by Investor to make independent investigations (including from independent legal counsel and estate planning professionals) regarding the legal and financial effect of executing this Acknowledgement.

No **(Yes / No) I represent and warrant that there are no Non-Owner Occupants living in my Property.**

**ACKNOWLEDGED BY OWNER(s):**

Patricia Bransford

Patricia S Bransford

Noah

Noah Offer ID: 104166

N/A (Yes / No) I represent and warrant that I have presented this Acknowledgment to, and discussed its contents with, all Non-Owner Occupants living in my Property. The names and signatures of all Non-Owner Occupants and their relation to me appear below.

ACKNOWLEDGED BY OWNER(s) and NON-OWNER OCCUPANTS:

Patricia Bransford

Patricia S Bransford

______________________________

[Name & Signature of Non-Owner Occupant]

______________________________

[Name & Signature of Non-Owner Occupant]

Noah

Noah Offer ID: 104166

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Recording Requested by:**

Noah (fka Patch Homes Inc.)

# MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT ("Recorded Memorandum"), is entered into as of 12/15/2021 (**"Effective Date"**) by and between Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively "Owner"), and Noah (fka Patch Homes, Inc), a **Delaware registered C. Corp.** company and its successors and assignees **("Benefited Party")**, whose address is 6621 California Street, Lower Unit, San Francisco, CA 94121.

## MEMORANDUM OF REAL ESTATE PURCHASE OPTION AGREEMENT

Owner hereby declares that Owner and Benefited Party have entered into that certain Noah Real Estate Purchase Option Agreement dated the same date as the Effective Date ("**Option Agreement**"), pursuant to which Owner grants and conveys to Benefited Party the option ("**Option**") to purchase an undivided fractional interest in all of that certain real property described in Exhibit A attached hereto (the "**Property**"), all as more particularly described, and on the terms and conditions stated in the Option Agreement. The fractional interest shall equal the Percentage Share, as specified in the Option Agreement. The Option is irrevocable by Owner. The term of the Option shall commence on the Effective Date and shall expire at 11:59 p.m., Pacific Time, on the day immediately preceding the Expiration Date. The terms of the Option Agreement are hereby incorporated into this Recorded Memorandum by this reference, and unless otherwise

defined herein, capitalized terms used in this Recorded Memorandum shall have the meanings attributed to such terms in the Option Agreement.

MEMORANDUM OF COVENANTS RUNNING WITH THE LAND

By entering into the Option Agreement, Owner has made certain covenants and promises to or for the benefit of Benefited Party in connection with the Property.

This Recorded Memorandum identifies the covenants and promises set forth in the Option Agreement that run with the land and are binding upon any party who acquires Owner's (or Owner's heirs, successors and assigns) interest in the Property for the benefit of the Benefited Party and its successors and assigns, so long as the Option Agreement remains in full force and effect and has not expired or been terminated in accordance with the terms provided for therein.

The covenants that run with the land are as follows:

a. Section 10.2 of the Option Agreement which, among other things, requires Owner to maintain and repair the Property and to ensure that use of the Property complies with all applicable state, federal and local laws and regulations.

b. Section 10.3 of the Option Agreement which, among other things, requires Owner to maintain insurance on the Property against all hazards in the amounts and types provided for therein.

c. Section 10.4 of the Option Agreement which, among other things, requires Owner to pay all taxes and assessments accruing on the Property.

d. Section 10.5 of the Option Agreement which, among other things: requires Owner to continuously occupy the Property as Owner's Principal Residence; requires that the Property be used as a single family residence; and prohibits use of the Property for any commercial or other non-residential purposes.

e. Section 10.1 of the Option Agreement which, among other things, restricts the ability of Owner to increase the amount of debt that is secured by a lien on the Property beyond the Maximum Authorized Debt specified in the Option Agreement.

f. Section 10.1 of the Option Agreement which, among other things, requires Owner to keep the Property free of liens not approved by Benefited Party.

g. Section 11 of the Option Agreement which, among other things, restricts the right of Owner to transfer the Property without Benefited Party's consent or deemed consent.

i. Section 4 of the Option Agreement which, among other things, requires Owner to provide Benefited Party with a right of first refusal in connection with any proposed sale of the Property by Owner.

## SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST

Each person whose signature appears below as Owner hereby irrevocably nominates, constitutes and appoints, in general, Benefited Party and its successor and assignees, and, in particular, each of its and their Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Managing Directors and Vice Presidents, as Owner's true and lawful agents and attorneys-in-fact (with full power of substitution) in Owner's name and on Owner's behalf (in any and all capacities) to exercise the powers set forth below consistent with the provisions contained in this Recorded Memorandum and in the Option Agreement ("**Power of Attorney**").

This Power of Attorney will be exercised:

(i) only when Benefited Party or its successor or assignee anticipates exercising the Option: and

(ii) only for the sole purpose of authorizing and empowering Benefited Party (although only a co-owner of the Property) to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein.

Accordingly, Benefited Party or its successor or assignee and the other parties designated above as attorneys-in-fact, shall have the power and authority to do all acts and to execute any and all documents, instruments and agreements as such agents and attorneys-in-fact deem necessary or advisable: (a) to solicit buyers for the entire Property and offers for a sale of the entire Property; (b) to advertise the entire Property for sale on reasonable and customary terms and conditions for a price that is reasonable in view of the then market conditions; and (c) to sell the entire Property and transfer Owner's entire interest in, and title to the Property on usual and customary terms and conditions, the proceeds of which will be allocated to Owner and Benefited Party as provided in the Option Agreement.

The Power of Attorney granted hereunder is coupled with an interest. All acts that the attorneys-in-fact shall lawfully do, or cause to be done, under the authority of this Power of Attorney are hereby expressly approved, ratified and confirmed.

Noah

Noah Offer ID: 104166

This Power of Attorney is a durable power of attorney as authorized and shall remain in force despite any Owner's subsequent incapacity or death.

## RELEASE

This Recorded Memorandum shall remain in full force and effect until released by a written release, quitclaim deed or other written termination of this Recorded Memorandum that is executed and notarized by Benefited Party and is recorded in the real property records for the county where the Property is located.

To the extent of any inconsistency between the terms of the Option Agreement and this Recorded Memorandum, the terms of the Option Agreement shall prevail and control.

*[Signatures and notarial acknowledgements appear on following pages]*

**Noah**

**Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford — *Patricia Bransford* Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

| | | |
|---|---|---|
| By | : | ____________________ |
| Name | : | Sonja McIntosh |
| Title | : | Signatory Authority |
| Date Signed | : | ____________________ |

**Noah** **Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford ____________________________ Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

By : [signature]

Name : Sonja McIntosh

Title : Signatory Authority

Date Signed : 12/1/2021

Noah

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF New York )

) ss.

COUNTY OF New York )

On 15th December, 2021, before me Davain Walker, Notary Public, personally appeared Patricia S. Bransford who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

Signature [signature]

(seal)

Noah

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF OREGON )
) ss.
COUNTY OF MULTNOMAH )

On 1 DECEMBER, 2021, before me GRACE ELIZABETH VOILES, Notary Public, personally appeared Sonja McIntosh who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of OREGON that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

OFFICIAL STAMP
GRACE ELIZABETH VOILES
NOTARY PUBLIC - OREGON
COMMISSION NO. 1005760
MY COMMISSION EXPIRES NOVEMBER 04, 2024

Signature ______________________

(seal)

Noah

Noah Offer ID: 104166

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]